STURM, RUGER & COMPANY, INC., Movant,

v.

Karol BLOYD and Gordon Price, Respondents.

Supreme Court of Kentucky.

July 3, 1979.

Rehearing Denied Aug. 21, 1979.

Uhel Barrickman, Richardson, Barrickman & Dickinson, Glasgow, for movant.

Bill Colvin, Greensburg, Donald F. Mintmire, Hensley, Craddock, Talley & Dunn, Horse Cave, for respondent Bloyd.

Robert M. Spragens, Jr., Lebanon, for respondent Price.

STERNBERG, Justice.

This is a products liability action. Karol Bloyd was hit in the ankle by a bullet which fired from a revolver when it was accidentally dropped on a concrete floor. It

---

presents a claim for an alleged defective design in a safety catch. The respondent, Karol Bloyd, filed suit against Gordon Price, the owner of the gun, and Sturm, Ruger & Company, Inc., the manufacturer of the gun. A jury awarded Bloyd $50,000 against Sturm, Ruger & Company and $2,796 against Price for negligence in the use of the gun. The Court of Appeals affirmed the judgment. This Court granted discretionary review and reverses.

A detailed statement of the facts is deemed necessary. First of all, Price, while a member of the United Stated Armed Forces and stationed in Berlin, Germany, purchased in 1973 the single-action .357-magnum Blackhawk revolver. It is an improvement over other single-action handguns and is a 1972 design and issue. Its safety device has three positions: (1) When the hammer is placed all the way down in what is called a safety notch, the gun is not supposed to fire; (2) There is a half-cocked position which is used for loading; and (3) In a full-cocked position the gun is ready for firing. Ordinarily, to fire this weapon the hammer must be pulled all the way back. The safety-notch position is not considered safe because a sharp blow on it will cause a very thin piece of steel to rupture, thereby letting the hammer go forward and igniting the cartridge. A clandestine safety lock is to let the hammer down middleways between two firing chambers. This causes the hammer to lock; however, the cylinder containing the bullets can easily rotate and when it does the gun will fire. The only sure safety of the revolver is to let the hammer rest on an empty chamber, thereby having five bullets in the chambers instead of six.

The first successful single-action revolver came out about 1847 and continued into the mid 1940's. During the 1950's movant (Ruger) started making this type of gun. It had substantially the same safety features as the earlier 1873 model single-action Colt revolver. It was emblematic of the western guns and was highly successful on the market. With the hammer on safety, other than on an empty chamber, the gun would fire if dropped from a height of eight to fifteen inches. There were four types of safety mechanisms that could have been incorporated into the subject weapon at a nominal cost for each. The gun then would have offered greater safety. Each of the safety designs would require some minor modification of the weapon. However, if modified and if dropped from a height of twelve inches and landing on the hammer, the gun was not likely to fire. When the gun was sold new, it was accompanied by a small pamphlet warning of the gun's unsafe safety mechanism and advising that if the gun was to be carried, the hammer should be on a chamber in which there was no bullet. The warning and notice, in words and figures, are as follows:

"SAFETY NOTE

If these revolvers are to be carried loaded, certain precautions *must* be observed in the interest of safety. (These precautions also apply to the older types of single action revolvers.)

Load only five chambers, placing the empty chamber in alignment with the firing pin and the hammer either in the safety notch or resting on the firing pin.

Do not carry one of these revolvers with a cartridge in line with the firing pin. Neither the safety nor the loading notch can be depended upon in case of a heavy blow on the hammer or the trigger. NEVER permit the hammer to rest on the firing pin with a loaded cartridge in line with the barrel. Under such circumstances, the firing pin will be in direct contact with the primer of the loaded cartridge and a light accidental blow on the hammer can readily cause the gun to discharge.

WARNING: This revolver can be fired by excessive pull on the trigger from either the safety notch position, indicated by No. 2 in Figure 1, or the loading notch position indicated by No. 3 in Figure 1.

The loading notch and the safety notch provide only partial security. If these notches are damaged, as they may be by

'fanning', they offer no security. Never depend on this or any other mechanical safety device to justify pointing the firearm at any person.

Fanning is unsafe for you and abusive to your revolver."

This was the only notice of the unsafe condition of the safety mechanism. The gun was advertised as a six-shooter. The unsafe feature of the weapon was retained at the expense of its pleasant appearance and nominal cost of modification. There were no similar guns manufactured in the United States that had different types of safety mechanisms. In 1973 the design of the safety mechanism was changed so that in the event the weapon did fall to a concrete floor it was not likely to discharge. Consequently, the new design was safer than the design of the subject gun.

Ruger cites four alleged errors:

1. Was the gun reasonably safe considering the directions and warnings furnished with it?

2. Was the gun so inherently dangerous as to make the manufacturer an insurer even if the product was perfectly safe if used according to directions?

3. Was the owner's negligence in misusing the gun reasonably foreseeable despite clear warnings and was, therefore, the owner's negligence the sole and proximate cause of the accident?

4. Should the court have defined "foreseeably probable" for the jury and instructed that the owner of the gun had a duty to exercise the highest degree of care?

In products-liability actions we are confronted with liability (1) by reason of the product being defective in its manufacture and (2) where the product is not defective but may be dangerous for the ordinary user unless he is notified. In the present case we are confronted with the latter. By their very nature firearms are dangerous, but do not kill people. It is the action of people in their use of firearms that kill or injure people. The criteria of liability by which the duty of a manufacturer is measured are whether it knew, or by the exercise of ordinary care ought to have known, that the equipment was limited in its safety design and that it should foresee a substantial likelihood that a user, exercising ordinary care for his own safety, might be injured by it. If so, the manufacturer is under a duty either to use reasonable care to remedy the design before selling it so that it is reasonably safe for its intended use and other uses which are reasonably foreseeable or to provide such warning as would be reasonably sufficient to bring the danger to an expectable user's attention and be understood by him.

It can hardly be contended that the warning and notice which accompanied the sale of the revolver did not clearly and succinctly advise of the shortcomings of the safety mechanism. The subject revolver displayed no physical attributes of being unsafe if and when used in the manner and method suggested by the manufacturer. Ruger, the manufacturer, is not a guarantor of the safety of the revolver. The evidence discloses that the subject revolver was not unsafe when used in the normal and usual manner. The use to which we find the gun being put is contrary to the instructions. Gordon Price, the owner of the gun, *read the warning and knew that the gun was not to be used in such a manner.* No one would contend that the gun was misused had the hammer been put down on the empty chamber, as directed by the instructions.

█ Although a gun is inherently dangerous, it does not necessarily follow that a manufacturer is liable in damages to each person injured or killed by the use of the weapon. There is nothing in the record to disclose that the subject revolver was any more dangerous than any other single-action revolver. In *Jones v. Hutchinson Manufacturing, Inc.,* Ky., 502 S.W.2d 66 (1973), we were confronted with an alleged defective design, and the question turned on what is reasonable care and what is reasonable safety? The maker is not required to design the best possible product or one as good as others make or a better product

than the one he has, so long as it is reasonably safe. A gun, although inherently dangerous, does not come within the category of those substances or chattels which, by their very nature, are not only inherently dangerous but unsafe for general use. Was Ruger required to anticipate that the revolver would be carried under the floor mat of an automobile with all six chambers loaded and the hammer resting on live ammunition? We think not. It is required of Ruger to anticipate reasonable use; that use being in keeping with the written warning. The dangerous propensity of the revolver was a condition rather than a cause.

Unquestionably, Gordon Price owned a revolver which he knew had a safety mechanism which was anything but safe. The written instructions which he received when he purchased the revolver explicitly, clearly and succinctly warned of its dangerous propensity. Nevertheless, and being fully advised of the revolver's lack of proficient safety mechanism, Price carried the revolver with him stored under the floor mat of his automobile with the trigger resting on live ammunition. The revolving chamber was built to hold six bullets; however, the safety warning advised that the revolver should not be carried with the hammer on a live cartridge, but the hammer should be on an empty chamber. Neither the manufacturing nor the design was a substantial factor in causing Bloyd's injury. Regardless of the design or manufacturing of the revolver, the use to which it was put was the agency that brought about the injury complained of. The manufacturer had no control over the gun. It was under the sole and exclusive control of Price, and his conduct in the handling of the revolver, as illustrated by the proof, was the substantial factor which caused the injury. In *Miller v. Watts*, Ky., 436 S.W.2d 515 (1969), we said, "The proximate cause is a cause which would probably, according to the experience of mankind, lead to the event which happened, . . .." Price knew the safety was defective; he knew he was carrying the gun contrary to the written warning; and he left the car in which the revolver was being carried for cleaning and washing without notice to the person who was to clean it that the revolver was there and that it should be handled carefully by reason of its unsafe condition. Culpable negligence on the part of Price! Pure and culpable negligence!

Our research has turned up a case in Missouri similar to the case at bar, which we need to discuss and differentiate. In *Bender v. Colt Industries*, Mo.App., 517 S.W.2d 705 (1974), Bender was injured when a revolver which he had purchased from a retailer fell from his hunting coat pocket onto a concrete platform. The gun discharged and struck Bender in the face. The gun was a Colt single-action revolver and was the predecessor of the .357-magnum Blackhawk. The safety mechanism was identical and "Defendant's expert witness acknowledged that Colt had always had trouble with the sear; it had known for years that it was fragile and likely to break. Plaintiff [Bender] had no knowledge of this defect. Plaintiff's expert . . . testified that the fracture and displacement of the sear caused the gun to discharge." The manufacturer therein interjected the "Exact Replica" theory, which would eliminate it from liability. In the instant case, we are not confronted with the Exact Replica principle; consequently, we will turn our attention to the charge of defect in design, since that is the issue presented in the instant case.

In each case, to fix liability on the manufacturer, it was charged that the gun was being used in a manner which could reasonably be anticipated by the manufacturer. The distinction between the Bender case and the case at bar can best be demonstrated by a comparison of the facts.

The *Bender* case is interesting, but the salient facts are dissimilar to the facts in the present case. The Colt revolver was sold directly to Bender, the person who was injured. On the occasion of Bender's injury, he had been using the revolver for target practice; had shot a complete round and reloaded; and was carrying the gun in a pocket of his hunting coat when it fell from his pocket as he knelt to pick up some

ammunition. There was no true safety lock, and the seller's literature did not warn or notify of the dangerous safety condition. In the instant case, however, the buyer of the Ruger revolver was not the person who was injured. The revolver was not being used but was being carried under the floor mat of a car and fell from the car when the person who was cleaning it removed the mat for cleaning. The manufacturer's and seller's literature warned and notified of the dangerous safety condition. Without equivocation, it is manifest that the revolver in the *Bender* case was being used as reasonably expected to be used. It was manufactured for the purpose of shooting and was being used in shooting. In the present case, there is no basis to conclude that the manufacturer could reasonably be expected to anticipate that the revolver would be carried loaded, stashed away under the floor mat of a car, and, above all, when the car was to be washed and cleaned that the person who owned the revolver would not tell the person doing the cleaning of the revolver's presence and dangerous propensity.

We find it unnecessary to decide whether there was any negligence on the part of Ruger by reason of the design.

The trial judge should have sustained Ruger's motion for a directed verdict and dismissed Bloyd's claim against the manufacturer, Sturm, Ruger & Company, Inc. Upon a return of this case, the court should enter a judgment notwithstanding the verdict in favor of the manufacturer.

In view of our decision that Bloyd's claim against the manufacturer should have been dismissed, we do not reach the other issues presented.

The decision of the Court of Appeals is reversed. This action is remanded to the Green Circuit Court for judgment in accordance with this opinion.

PALMORE, C. J., and LUKOWSKY and STEPHENSON, JJ., concur.

REED, AKER and CLAYTON, JJ., dissent.

PALMORE, C. J., files a separate concurring opinion.

REED, J., files a dissenting opinion in which AKER and CLAYTON, JJ., join.

PALMORE, Chief Justice, concurring.

My concurrence in the result reached by the majority opinion rests upon two basic principles mentioned in *Ulrich v. Kasco Abrasives Co.,* Ky., 532 S.W.2d 197, 200, 201 (1976). One is that whether a product is "unreasonably dangerous" when put on the market is to be assessed in terms of those persons "who should be expected to use or be exposed to it." I simply do not think that an innocent bystander in a garage or service station where an automobile owned by the possessor of a gun is being washed comes within the category of persons whom the manufacturer or seller of the gun should expect to be exposed to it. Had the gun been dropped accidentally by Price himself, perhaps a case could be made for the proposition that the manufacturer should have anticipated that other persons in his presence would be exposed, but in this instance Price was not handling the gun and his presence or absence was immaterial. It was purely a freak accident.

The other principle is that even if the gun was unreasonably dangerous it would hardly be fair to hold the manufacturer responsible for such an unforeseeable act of negligence on the part of a possessor who had been fully warned of the danger. In recent years the doctrine that one is not required to anticipate the negligence of another may have lost some of its quondam vitality, but it is not dead yet. It is my firm opinion that this accident resulted from an act of negligence on the part of Price that the manufacturer was not bound to foresee, and which therefore was a superseding cause.

REED, Justice dissenting.

I respectfully dissent. It appears to me that the Court of Appeals correctly affirmed the judgment of the trial court.

It is unnecessary to consider strict liability, in my judgment, because it appears the defendant was subject to liability under ordinary negligence principles. My only disagreement with the Chief Justice is concerning the element of foreseeability so far as the defendant's possible liability is involved. There are many situations in which a reasonable manufacturer would be expected to anticipate and guard against the conduct of others. When the risk becomes a serious one, either because the threatened harm is great or because there is an especial likelihood that it will occur, reasonable care, in my judgment, demands precautions against occasional negligence, which is one of the ordinary incidents of human life and therefore to be anticipated. It is not due care to depend upon the exercise of care by another when such reliance is accompanied by obvious danger. See Prosser, *Law of Torts*, Sec. 33 at 170–71 (4th ed. 1971).

The majority opinion fairly states the obvious danger in marketing this pistol with the only warning contained in a separate operating manual. The harm that occurred was within the general area of the risk created by the manufacturer's negligence. The defendant is not confined to foresee the precise method of causing the harm. It is enough if it is reasonable for him to foresee the general area of the risk of harm.

I would affirm the judgment of the Court of Appeals.

AKER and CLAYTON, JJ., join in this dissent.