892 P.2d 1354

**A. UBERTI AND C., an Italian corporation, Petitioner,**

**v.**

**John S. LEONARDO, Judge of the Superior Court of the State of Arizona, In and For the COUNTY OF PIMA, Respondent,**

**and**

**Thomas Cordova and Delia Cordova, surviving parents of Corrina Cordova, deceased, Real Parties in Interest.**

**No. CV–94–0062–PR.**

Supreme Court of Arizona,
En Banc.

April 11, 1995.

---

566

David T. Hardy, Tucson, for Petitioner.

Leighton H. Rockafellow, Tucson, for Real Parties in Interest.

## OPINION

FELDMAN, Chief Justice.

Two-year-old Corrina Cordova died in a 1991 handgun accident in Tucson. Thomas and Delia Cordova, her parents ("Plaintiffs"), sued A. Uberti and C. ("Defendant"), an Italian firearms manufacturer, claiming it manufactured and distributed a defective and unreasonably dangerous revolver that caused the accident. Defendant moved to dismiss the complaint for lack of in personam jurisdiction. The trial judge denied the motion, but the court of appeals accepted special action[1] jurisdiction and granted relief, ordering the trial judge to dismiss the complaint.

We granted Plaintiffs' petition for review to examine whether Arizona can assert jurisdiction over Defendant. *See* Ariz.R.Civ. App.P. 23(c)(4). We have subject matter jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24.

## FACTS AND PROCEDURAL HISTORY

### A. The revolver

■ We view the facts in the light most favorable to Plaintiffs, the non-moving party. *Estate of Hernandez v. Arizona Bd. of Regents,* 177 Ariz. 244, 247, 866 P.2d 1330, 1333

---

1. In Arizona, relief formerly obtained by writs of prohibition, mandamus, or certiorari is now ob-   tained by "special action." Ariz.R.P.Spec.Act. 1.

(1994). As a result, in reviewing summary judgment for Defendant we must accept Plaintiffs' contention that the gun was defective and unreasonably dangerous.

Before the fatal accident on November 29, 1991, Henry Pacho, a Tucson resident, acquired a .357 magnum revolver manufactured in Italy by Defendant and sold through its American firearms distributor, Iver Johnson Arms. Henry cleaned the weapon, fired it a few times, wrapped it in a towel, and then stored it, fully loaded, under the seat of his car. He forgot about the revolver until the day of the accident when his wife, Ruby, took the car to a self-serve car wash with her sister and two children. One of the children was Corrina, Ruby's niece. Before washing the car, Ruby vacuumed the interior. As she pulled the towel from the car, the gun fell to the pavement and discharged. The bullet struck Corrina in the head and killed her.

Defendant produced the gun as a replica of the 1873 Colt "Peacemaker" and called it the "Cattleman." To preserve its authentic look and design, the gun was made without modern safety devices that would have prevented the accidental discharge that killed Corrina. Defendant's catalog described the gun as follows:

SINGLE ACTION 1873 CATTLEMAN

Slip it out of its holster, twirl it round your finger, raise and aim it all in one movement. It is balanced and sighted with the natural shooter in mind, and has no match the world over. Today as yesterday, it is the '73, the "Peacemaker," the "Frontier". Identical in shape and dimensions to its predecessor, this replica is safe, precise, trusty and indestructible, a legend since 1873.

Appendix to Plaintiff's Petition for Review at 58 (side 2).

Colt Industries manufactured the first Peacemaker six-shot, single-action revolver in 1873. It was adopted for United States government service that same year and became known as "the gun that won the West." In 1892, Colt and other gun manufacturers began making safer, more reliable, and more efficient revolvers with a double-action feature [2] and a swing-out, rather than fixed, cylinder. The federal government replaced the Peacemaker with newer models partly because the Peacemaker did not meet government safety standards. Despite a diminishing market, Colt continued making the 1873 model until 1941 and resumed production in 1956. *See Bender v. Colt Indus., Inc.,* 517 S.W.2d 705, 706–07 (Mo.App.1974).

In the 1950s, television westerns created a new market for replica firearms. Erik Larson, *Sturm Ruger Defends a Revolver in Hundreds of Lawsuits,* WALL ST. J., June 24, 1993, at A1. Sturm, Ruger & Co. ("Sturm Ruger"), an American firearms manufacturer, brought back the single-action revolver, replicating the 1873 Peacemaker and calling it the "Old Model." Sturm Ruger sold over 1.5 million of these replicas after beginning production in 1953. Due to many injuries from accidental discharges and resulting lawsuits,[3] Sturm Ruger stopped producing the Old Model in 1973 and brought out a new single-action revolver that incorporated a safety mechanism to prevent accidental discharges. Since 1973, however, long after lawsuits drove Sturm Ruger from this hazardous market, Defendant continues to manufacture faithful replicas of the 1873 six-shooter without the safety devices found on other guns.

Safe carriage and storage of the Cattleman require that the hammer be down (uncocked) *and* resting on an empty chamber to prevent discharge if the gun's hammer is hit. Resting the hammer on a loaded chamber is

---

**2.** With a single-action revolver, the hammer must be pulled back and cocked before the gun can be fired. The newer, double-action revolver can be fired without first cocking the hammer.

**3.** *See, e.g., Sturm, Ruger & Co. v. Day,* 615 P.2d 621 (Alaska 1980); *Sturm, Ruger & Co. v. Bloyd,* 586 S.W.2d 19 (Ky.1979). *See generally* Larson, *supra,* at A1. Larson notes that by 1981, the Old Model accounted for 190 reported injuries from

accidental discharges. *Id.* In 1981, Sturm Ruger reported that 60 suits associated with the Old Model were filed against it. *Id.* Although it settled most of the cases, 12 of the 17 cases that reached a court decision were decided in Sturm Ruger's favor, some on appeal. *Id.* However, in 1982, settlements cost Sturm Ruger almost one-quarter of its net income. *Id.*

extremely unsafe. *See, e.g., Johnson v. Colt Indus.*, 797 F.2d 1530, 1532 (10th Cir.1986) (referring to "drop-fire" hazard). As originally designed, the Peacemaker's hammer rested very close to the firing pin when uncocked. If the hammer rests on a loaded chamber and is struck even by a moderate force, the gun can fire. Later models have various drop-fire safety devices, such as a transfer bar, that prevent the hammer from striking the firing pin when the safety is engaged. Without the safety features of modern firearms, when carrying six live rounds the Cattleman is as inherently dangerous as the original Peacemaker. According to the affidavits of record, the absence of improvements used in other firearms to guard against the risk of accidental firing made the Cattleman both defective and unreasonably dangerous. *See also Bender,* 517 S.W.2d at 706; *Sturm, Ruger & Co. v. Bloyd,* 586 S.W.2d 19, 20 (Ky.1979).

The gun in this case was fully loaded when Henry put it under the car seat. Defendant attempted to correct the danger posed by a loaded single-action revolver by designing a safety notch on the hammer that would engage the trigger when the hammer is pulled back to its quarter position. However, Plaintiffs' firearm expert stated in his affidavit that either this gun did not have a safety notch or it failed when the gun fell from the car.[4] Thus, with or without the safety feature engaged, the loaded revolver may have been equally susceptible to accidental discharge when dropped.

## B. Legal proceedings

After their daughter's death, Plaintiffs brought this action against Defendant in Pima County, alleging Defendant was liable for the design, manufacture, sale, and distribution of a defective and unreasonably dangerous product.[5] Defendant moved to dismiss or, in the alternative, for summary judgment based on lack of personal jurisdiction. Several documents and affidavits supported the motion. Plaintiffs responded by offering supporting documents and affidavits of their own. The judge and counsel treated the matter as a motion for summary judgment, with both parties citing to the documents and affidavits that accompanied all filed pleadings.

■ Some of the evidentiary materials contained in the documents and affidavits relating to the motion may be subject to objection on foundational, hearsay, or other evidentiary grounds. Neither counsel nor the trial judge raised any evidentiary dispute in the summary judgment proceedings, and so far as the record before us shows, the judge relied on the affidavits and documents in making his findings. Accordingly, at least at this stage of the proceedings, we deem any evidentiary objection waived. *Ancell v. Union Station Assoc.,* 166 Ariz. 457, 460, 803 P.2d 450, 453 (App.1990) (evidentiary and foundational objections to sufficiency of supporting documents attached to summary judgment pleadings are necessary to allow offering party an opportunity to cure defects); *see also Barone v. Rich Bros. Interstate Display Fireworks,* 25 F.3d 610, 611 n. 2 (8th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 359, 130 L.Ed.2d 313 (1994) (objections to evidence must be raised at trial court to be considered on review).

The trial judge made eight findings of fact concerning personal jurisdiction over Defendant:

THE COURT FURTHER FINDS that plaintiff has established sufficient purposeful contact with Arizona by defendant ... to establish personal jurisdiction ... under *Asahi Metal Industry v. Superior Court,* 480 U.S. 102 [107 S.Ct. 1026, 94 L.Ed.2d

---

4. When the hammer is pulled to its first click—"quarter-cocked"—a safety notch on the hammer engages the trigger. In this position, the gun cannot be fired until the hammer is brought to its full-cocked position. According to Plaintiffs' firearm expert, however, this safety mechanism is mechanically too weak to reliably perform its function and historically has proven ineffective. *See also Bender,* 517 S.W.2d at 706. The expert examined the revolver and found that this safety feature either was dysfunctional when Pacho placed it under the car seat or broke when the gun fell.

5. Arizona follows the doctrine of strict liability. *Dart v. Wiebe Mfg., Inc.,* 147 Ariz. 242, 246–48, 709 P.2d 876, 880–82 (1985) (strict liability analysis applies "defective and unreasonably dangerous" test to product quality and design).

92] (1986). Those actions which go beyond the mere stream of commerce theory of foreseeability are: (1) defendant's catalog printed in English and distributed by distributors in the United States. (2) *defendant's guns are designed for appeal to the Western United States consumers.* (3) defendant has at least eight U.S. distributors. (4) defendant has [exported] into the U.S. over 10,000 firearms between January 1, 1988 and July 30, 1992. (5) defendant's firearms are sold through Tucson gun stores, at least three of which regularly stock them. (6) printed instructions that accompany defendant's firearms when purchased in Arizona are in English and include defendant's Italian address and phone number. (7) a listing of defendant's line of gun production including pictures is printed in English. (8) the writing on the packaging for defendant's firearms sold in Arizona are printed in English and include the Italian address and phone number of defendant.

Based on the foregoing, it is ordered defendant's motion to dismiss (motion for summary judgment) based on lack of personal jurisdiction is denied.

Minute Entry Order of Nov. 15, 1993 (emphasis added).

The court of appeals reasoned that jurisdiction could not be asserted unless Defendant "purposefully directed" its activities at Arizona and the case resulted from injuries arising from or relating to those activities. *A. Uberti & C. v. Leonardo,* 177 Ariz. 451, 453, 868 P.2d 1034, 1036 (App.1994) (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985)). The court of appeals held that events "after the manufacture and sale of the gun in question" were irrelevant and "cannot support the assertion of personal jurisdiction." *Id.* After disposing of seven of the trial court's eight findings as factually irrelevant, the court held that the remaining finding (No. 2) and the facts of the case as a whole provide "no basis for concluding that in 1974 Uberti purposely directed its activities toward the United States, much less toward Arizona, such that it could expect to defend a lawsuit here." *Id.*

We review de novo a dismissal for lack of in personam jurisdiction and "simply look to the non-moving party to make a prima facie showing of jurisdiction." *Barone,* 25 F.3d at 611; *Maloof v. Raper Sales, Inc.,* 113 Ariz. 485, 487, 557 P.2d 522, 524 (1976). We conclude that a prima facie showing was made in this case.

## DISCUSSION

### A. Specific jurisdiction

Plaintiffs do not contend Arizona has general jurisdiction over Defendant. Indeed, Defendant has no agents, no physical presence, no offices, and no property within Arizona. *Batton v. Tennessee Farmers Mut. Ins. Co.,* 153 Ariz. 268, 270, 736 P.2d 2, 4 (1987). Instead, the question is one of "specific jurisdiction." *Maloof,* 113 Ariz. at 487, 557 P.2d at 524 (specific jurisdiction applies when there is no general jurisdiction, the cause of action arose in the forum state, the defendant caused the event to occur, and the exercise of jurisdiction comports with the Fourteenth Amendment).

Defendant claims that no personal jurisdiction exists under either the Arizona or United States Constitution. We easily resolve the issue with respect to our state constitution. Arizona will exert personal jurisdiction over a nonresident litigant to the maximum extent allowed by the federal constitution. Ariz.R.Civ.P. 4.2(a); *Houghton v. Piper Aircraft Corp.,* 112 Ariz. 365, 367, 542 P.2d 24, 26 (1975) ("Arizona's long arm statute . . . is intended to give Arizona residents the maximum privileges permitted by the Constitution of the United States."). The jurisdictional issue thus hinges on federal law.

■ Under the federal constitution, two factors govern the scope of due process for in personam jurisdiction: (1) the defendant's "minimum contacts" with the forum state and (2) the reasonableness of exercising jurisdiction over the foreign defendant. *Asahi Metal Indus. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). We first consider the nature and extent of Defendant's contacts with Arizona.

## B. Minimum contacts

### 1. *Legal test*

Did Defendant have sufficient minimum contacts with Arizona to allow our courts to exercise jurisdiction in accord with fundamental principles of fairness as required by the Fifth and Fourteenth Amendments? *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Two views of the minimum contacts requirement split the Supreme Court in *Asahi*, its most recent personal jurisdiction case. Four justices [6] concluded that jurisdiction depends on "whether the defendant purposefully established 'minimum contacts' in the forum state" by placing products into the stream of commerce and engaging in forum-related conduct. *Asahi*, 480 U.S. at 108–09, 107 S.Ct. at 1030 (quoting *Burger King*, 471 U.S. at 474, 105 S.Ct. at 2183). These contacts must be based on acts "by which the defendant purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id.* at 109, 107 S.Ct. at 1030. While disclaiming the idea that foreseeability was wholly irrelevant to personal jurisdiction, these four justices required something more than the mere foreseeability that the defendant's products could injure a resident of the forum state before the exercise of jurisdiction would comport with due process. *Id.* at 110, 107 S.Ct. at 1031. Conduct showing the defendant's intent to serve the forum state's market must involve some substantial connection between the defendant and the forum state. *Id.* at 112, 107 S.Ct. at 1032. The defendant must do more than merely put the product into the stream of commerce, knowing that it may find its way to the forum state. *Id.*

Four other justices took a broader stance, concluding that the minimum contacts aspect of due process was satisfied if the defendant was aware of its product's entry into the forum state through the ordinary distribution

channels of the stream of commerce. *Id.* at 117, 107 S.Ct. at 1034–35 (Brennan, J., concurring in part) ("the stream of commerce refers ... to the regular and anticipated flow of products from manufacturer to distribution to retail sale" and provides sufficient contacts for exercising jurisdiction so long as the "participant in this process is aware that the final product is being marketed in the forum state" and so long as the product does not get to the forum state as part of the "unpredictable currents or eddies" of commerce). Thus, due process does not demand additional conduct by the defendant.

We do not enter the debate between these two views, nor do we speculate on its ultimate resolution. Instead, we decide this case under *Asahi*'s more restrictive interpretation of due process:

> The "substantial connection," between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State.* The placement of a product into the stream of commerce, without more, is not an act of the defendant purposely directed toward the forum State.

*Id.* at 112, 107 S.Ct. at 1032 (O'Connor, J.) (emphasis added). We therefore examine those facts for indicia of intent to serve the forum state's market.

### 2. *Defendant's position*

Defendant's argument parallels the court of appeals' reasoning: Defendant's contacts with Arizona between the date of manufacture and the date of the accident, even though those contacts involve the same product, are irrelevant. Defendant contends that the only contacts with Arizona that should concern us are those in 1974, when Defendant manufactured and first sold the gun, placing it in the stream of commerce. Although Defendant could have foreseen that

---

6. Justice O'Connor wrote the Court's opinion, with Chief Justice Rehnquist and Justices Powell and Scalia joining in all parts. Justices White, Marshall, and Blackmun joined Justice Brennan's concurring opinion in which he dissented from the minimum contacts part of the Court's opinion. Justice Stevens wrote separately to say

that he found it unnecessary for the Court to reach the question because California's exercise of jurisdiction was unreasonable whether or not the defendant had purposeful contacts with California. *Asahi*, 480 U.S. at 121–22, 107 S.Ct. at 1037.

its product, exported to the United States through an independent American distributor, might find its way to Arizona and there cause harm, Defendant contends that mere foreseeability that the stream of commerce may bring the product to Arizona or any other state—like a leaf in the trade winds—is insufficient. On that point, Defendant may be correct. *Burger King*, 471 U.S. at 474, 105 S.Ct. at 2183 (foreseeability in causing injury is distinguished from foreseeability in causing injury in a specific state; a state may not exercise personal jurisdiction solely because a product fortuitously arrived and caused injury) (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

We believe, however, that the record shows a great deal more than the mere foreseeability that in today's world any product—like this Italian weapon—may end up anywhere. Defendant's reliance on *World–Wide Volkswagen* is factually misplaced. In that case, the plaintiff purchased an automobile from a New York dealer, drove it to Oklahoma, and was severely injured when it exploded into flames after another car hit it. The plaintiff sued the New York dealership and national distributor in Oklahoma. The Court held that Oklahoma had no jurisdiction over the dealership and distributor, which operated and intended to operate only on an intra-state basis even though they must have foreseen that some of the vehicles they sold would be driven to other states, such as Oklahoma. Such foreseeability is not the kind that renders a state's exercise of personal jurisdiction valid under the due process clause. *Asahi*, 480 U.S. at 109, 107 S.Ct. at 1031 (citing *World–Wide Volkswagen*, 444 U.S. at 297–98, 100 S.Ct. at 567). But the *World–Wide Volkswagen* Court did *not* hold that Volkswagen, the manufacturer, could not be sued in Oklahoma. The question in the present case does not involve jurisdiction over a dealership doing business only in a particular state. This case concerns jurisdiction over a manufacturer that *did not limit sales to any specific state.*

■ We turn then to examine the facts relating to in personam jurisdiction as they existed at the time the gun entered the stream of commerce. We do not measure minimum contacts by Defendant's present activities in Arizona. *See Barone*, 25 F.3d at 611 (focusing its jurisdictional analysis on the defendant's contacts with the forum state in the years just prior to the accident). We consider Defendant's recent business activities only insofar as they shed light on its contacts in 1974.

### 3. *Made for America*

■ It is undisputed that Defendant knowingly and intentionally manufactured its products for the United States. The record establishes that Defendant knew its products, passing through its American distributor, Iver Johnson, would flow into local markets across America.

Of some importance, we believe, is Defendant's own description of its business. Defendant's catalog states:

> A note from the production facilities of Aldo Uberti and Company Gardone V.T., Italy. Founded in 1959 especially to produce replica percussion revolvers, the firm of Aldo Uberti has become the largest and best known producer of historical arms of all types in the world.
>
> *From the first* our firearms have exactly duplicated the lines and proportions of the original Colts, Winchester, Henrys, Derringers.... Recognized throughout the world as the finest firearms of their type, all are accepted ... as perfect duplicates of the originals in all aspects.
>
> \*    \*    \*    \*    \*    \*
>
> All of our firearms are proof tested at the Italian National Proof House and are so stamped.

Appendix to Plaintiff's Petition for Review at 51 (emphasis added). This description suggests that Defendant's products are not manufactured for exclusive sale in the Italian market. Other facts reinforce the conclusion that Defendant made these guns for the American market.

According to Bureau of Alcohol, Tobacco and Firearms records, Defendant made the revolver that killed Corrina and sold it to Iver Johnson Arms in November 1974. The gun was manufactured to the design and

specifications prepared by and contracted for by Iver Johnson, a Massachusetts corporation that wanted to market a replica of the 1873 Colt single-action revolver in the United States under Iver Johnson's name, and therefore was made for distribution only by Iver Johnson. Pietro Uberti, Defendant's delegated administrator, acknowledged that Defendant marked the finished firearm with Iver Johnson's name. *Both* "Iver Johnson's Fitchburg Mass.—U.S.A." *and* "A. Uberti & C. Gardone V.T. Italy" were stamped on the gun in question. Once the firearms arrived in America, Iver Johnson was to package them along with instructions, warnings, and other materials and market them as the Iver Johnson Cattleman.

Defendant delivered the firearms in Italy, F.O.B. Milan, to Iver Johnson through an intermediary, L.A. Distributors, which may have been under the same management as Iver Johnson. In any event, Defendant manufactured the guns for Iver Johnson, a distributor known to Defendant as an American company serving the American market. Through this distribution channel, Defendant exported its products from Italy to the United States *by direction* rather than chance. *See Charles Gendler & Co., Inc. v. Telecom Equip. Corp.*, 102 N.J. 460, 508 A.2d 1127, 1137 (1986) ("the system through which the manufacturer distributes its products evidences the manufacturer's purposeful penetration of the market").

The manufacturing and export-import arrangement between Defendant and Iver Johnson was not an isolated transaction but the start of a substantial business relationship. Between 1973 and 1978, Uberti manufactured for export and sale to Iver Johnson over 22,000 single-action Cattleman revolvers. In 1974, the year Defendant produced the gun in question, Defendant made and exported 2,138 of the guns to the United States for distribution by Iver Johnson. Thus, the gun in question reached America deliberately, not fortuitously, as part of a stream of Defendant's products designed and directed for export to America.

Defendant emphasizes that it did not exercise any control over Iver Johnson's distribution once the guns left Italy. Accepting this assertion does not, we believe, change the essential fact that distinguishes this case from *Asahi*. In that case, a Japanese component manufacturer made valve assemblies for tubes and tires and sold them to several manufacturers, including a Taiwanese firm that incorporated the valve assembly into its finished tubes, which it then sold throughout the world, including the United States. 480 U.S. at 106, 107 S.Ct. at 1029. The component manufacturer had little control over the final destination of its products once they were delivered into the stream of commerce because they were ferried to distant, worldwide markets in other manufacturers' finished goods. In contrast, Defendant not only placed a *finished* product into a trade stream of its own choosing but chose a distributor intending to penetrate the American market.

The record supports the trial judge's finding that Defendant's gun was designed and manufactured for the American market. Defendant made the gun to the specifications of an American importer. This replica was obviously never meant for sale or distribution to any nation's military force or for use by hunters seeking game or citizens seeking self-protection. It is and was "[f]rom the first," as Defendant's catalog indicates and the trial judge concluded, of interest only to gun enthusiasts and collectors enthralled with the Old West and its weapons. Tires are used everywhere, but guns like this are peculiarly American. Thus, although we do not doubt there are non-American gun collectors interested in these firearms, the trial judge legitimately inferred in finding No. 2 that this was a product made for America.

Also important, we believe, are facts showing the distribution of Defendant's guns after 1974. Although we evaluate the minimum contacts between Defendant and Arizona up to the date of the gun's manufacture and sale to Iver Johnson, Defendant's catalogs and advertising and subsequent developments support the conclusion that the gun, as a replica of an American frontier weapon, was originally and primarily designed and made for the American market. We therefore disagree with the court of appeals and conclude that the record does support the trial judge's finding that "[D]efendant's guns are designed

for appeal to the western United States consumers."

This conclusion is significant. As Justice O'Connor said in *Asahi:*

Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, *designing the product for the market in the forum State,* advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or *marketing the product through a distributor who has agreed to serve as a sales agent in the forum State.*

480 U.S. at 112, 107 S.Ct. at 1032 (emphasis added, citations omitted).

The facts in this case amply support—indeed compel—the trial judge's conclusion that the gun was designed for the western states and knowingly marketed through a distributor to intentionally serve the United States.

### 4. *Intent to serve Arizona*

Defendant argues, however, that the record will not support the conclusion that Defendant specifically intended its guns to be marketed in Arizona. Indeed, for all this record shows, Defendant never heard of Arizona. This raises the following question: Having shown that the gun was knowingly designed for and exported to exploit the market of the United States or western United States, must Plaintiffs additionally show that Defendant had the specific intent to market the gun in Arizona, or is it enough to show that Defendant intended to market it in any state, group of states, or all states? We conclude that only the latter is necessary.

Defendant argues that its activities, at best, focused on the United States in general, not Arizona. Therefore, Arizona exceeds due process by asserting its jurisdiction here. Were this true, then no individual state could assert jurisdiction over Defendant simply because Defendant did not target a particular state or group of states but instead intended

to sell its product to all of America. The argument turns common sense on its head. Holding that a defendant intending to sell its products to any and all citizens in the United States could not be held accountable in any jurisdiction where its products caused injury defies any sensible concept of due process. We have no doubt that Defendant did not care whether its guns were sold in Arizona, Massachusetts, or California, but it is quite clear that through its distributor Defendant contemplated serving the market throughout America. Given evidence of intent to serve this market, according to Justice O'Connor's opinion in *Asahi* principles of due process permit suit against Defendant in states where its products cause damage.

Hence if the sale of a product of a manufacturer or distributor ... is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owners or to others.

480 U.S. at 110, 107 S.Ct. at 1031) [7] (quoting *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567, and *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958)) (quotes omitted)).

This is not a *World–Wide Volkswagen* case involving a dealership limited to serving a state's market but a much broader case involving an international manufacturer through its chosen distributor serving and intending to distribute to the national American market. Thus, we do not believe that Plaintiffs must show Defendant's specific intent to sell in Arizona. An intent to sell across America is enough.

It is also true that nothing in this record indicates that Defendant knew the extent of Iver Johnson's sales efforts. Nor is there any indication that Defendant attempted to make itself aware of or restrict those efforts. We do not believe that a foreign manufactur-

---

**7.** We bear in mind that *Asahi* did not hold that California had no jurisdiction over the Taiwanese valve stem manufacturer in an action brought by the injured consumer. The Court held only that

the valve stem manufacturer was not amenable to California jurisdiction in an indemnity action brought by the Japanese tire manufacturer.

er that knowingly and intentionally distributes its products in America through an American company can avoid jurisdiction of American courts by the simple expedient of closing its eyes and making no effort to learn about or restrict its distributor's activities.[8] To confer immunity in that situation makes no legal sense. *See Giotis v. Apollo of the Ozarks, Inc.,* 800 F.2d 660, 667 (7th Cir. 1986), *cert. denied,* 479 U.S. 1092, 107 S.Ct. 1303, 94 L.Ed.2d 158 (1987).

Moreover, Defendant's argument defies economic logic. Due process does not give foreign companies a safe harbor to manufacture goods designed for and shipped to America and at the same time immunize them from the penalties of noncompliance with American safety standards. Such a rule would drive American manufacturers out of business while allowing foreign businesses to produce, with absolute immunity, unreasonably dangerous and defective products for the American market. We see no violation of traditional notions of fair play and substantial justice in holding manufacturers of goods destined for America legally responsible if those goods are defective and unreasonably dangerous and cause harm in America.

Solid precedent supports this conclusion. In *Barone,* the Third Circuit held that a fireworks manufacturer/seller heading a network of several regional distributors and "thus realizing the much greater economic benefit of multiple sales in distant forums ... may satisfy the purposeful availment test" of the more restrictive view in *Asahi.* 25 F.3d at 613 (quoting *Giotis,* 800 F.2d at 667). *See also Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, 1548–50 (11th Cir.1993) (after applying Justice O'Connor's view of minimum contacts, finding jurisdiction over foreign carmaker who sold its products to a U.S. distributor who took title in France but engaged in additional forum-related conduct such as designing cars for America). For jurisdictional purposes, we see no difference between a manufacturer

distributing products nationally through several regional distributors and a manufacturer distributing through a single national distributor. *See Tobin v. Astra Pharmaceutical Prod., Inc.,* 993 F.2d 528, 543 (6th Cir.) (a "deliberate decision to market" products in all 50 states through a national distributor satisfies the more restrictive view of purposeful availment test in *Asahi* ), *cert. denied sub nom. Duphar v. Tobin,* —— U.S. ——, 114 S.Ct. 304, 126 L.Ed.2d 252 (1993).

Further, as *Barone* indicates, even if the manufacturer has no actual knowledge, its distributor's actions "may suggest an effort to reach much of the country." 25 F.3d at 613. The same is true here. Iver Johnson's advertisements in national gun magazines and descriptions in Defendant's catalog cater to an unrestricted nationwide market that includes Arizona. *See Morris v. SSE, Inc.,* 843 F.2d 489, 494 (11th Cir.1988) (advertising in national trade magazine sufficient to establish that defendant advertised in forum state). It is fair to say after *Asahi,* as it was before, a foreign manufacturer's use of an independent American distributor "will not insulate a non-resident foreign corporation from suit." *Poyner v. Erma Werke Gmbh,* 618 F.2d 1186, 1190 (6th Cir.) (foreign manufacturer's gun brought to forum state possibly through the same distributor, L.A. Distributors, that shipped Uberti's gun to Iver Johnson), *cert. denied sub nom. Insurance Co. of N. Am. v. Poyner,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980).

Allowing a defendant that has purposefully exploited the United States market to "insulate itself from the reach of the forum State's long-arm rule by using an intermediary or by professing ignorance of the ultimate destination of its products" would undermine principles of fundamental fairness and due process. *DeJames v. Magnificence Carriers, Inc.,* 654 F.2d 280, 285 (3rd Cir.1981); *see also Vermeulen,* 985 F.2d at 1548 (delivering title in foreign country "in no way determines the degree of contacts between the United States

---

8. Defendant could have avoided the risk of products liability in Arizona by making some affirmative effort to preclude distribution of its products in our state. *See Bush v. BASF Wyandotte Corp.,* 64 N.C.App. 41, 306 S.E.2d 562, 568 (1983) (lawful assertion of personal jurisdiction when

manufacturer "purposefully injected [its] product into the stream of commerce without any indication that it desired to limit the area of distribution of its product so as to exclude North Carolina").

and [the defendant]"); *Burger King*, 471 U.S. at 474, 105 S.Ct. at 2183 (due process is not a territorial shield to avoid interstate obligations that have been voluntarily assumed).

The evidence, in fact, shows that Defendant's guns have been available for sale to Arizona residents since at least 1974, the year the gun in question was first sold. Although Defendant's name is not mentioned, GUN DIGEST, a national publication for the firearms trade and gun enthusiasts, listed the Cattleman in Iver Johnson advertisements in 1974 and 1975. Defendant's Appendix to Opposition for Petition for Review at 165.[9] *See Poyner*, 618 F.2d at 1191 (German gun manufacturer found to have purposefully availed itself of Kentucky consumers through U.S. distributor's national and regional advertisements). Thus, we hold that the minimum contacts requirement for exercising personal jurisdiction is met.

## C. Fair and reasonable exercise of jurisdiction

In addition to Defendant's minimum contacts with Arizona, we must consider whether it is reasonable to subject Defendant to Arizona jurisdiction. *Asahi*, 480 U.S. at 115, 107 S.Ct. at 1033. This requires us to weigh several factors: Defendant's burden of transoceanic litigation, Arizona's interest in resolving this products liability action, Plaintiff's interest in obtaining relief in Arizona, and another nation's procedural and substantive interests in Arizona's exercise of jurisdiction. *Id.* at 113–15, 107 S.Ct. at 1033–34.

In *Asahi*, the entire Court agreed that it was unreasonable to subject the defendant to California's jurisdiction. The Taiwanese plaintiff in *Asahi* sought indemnification from the Japanese valve-stem manufacturer for the judgment the court rendered in favor of the California resident who was injured when the product failed. The Supreme Court found the Japanese defendant's burden in submitting to litigation in a distant and unfamiliar judicial system far greater than California's slight interest in the outcome of an indemnification claim between two foreign corporations. *Id.* at 114–15, 107 S.Ct. at 1033. Moreover, the Court was circumspect about "extending our notions of personal jurisdiction into the international field." *Id.* at 115, 107 S.Ct. at 1034 (citation omitted). Even if the defendant might have had sufficient contacts with the forum state, a unanimous Court found California's exercise of personal jurisdiction unfair and unreasonable. *Id.*

This case is different; *Asahi*'s facts are inapposite. Arizona has a strong interest in protecting the health, safety, and welfare of its residents. Exercising jurisdiction over a manufacturer of defective and unreasonably dangerous consumer products provides a forum for Arizona residents harmed by such products and a deterrent to selling unreasonably dangerous products in the state. Moreover, the accident occurred in Arizona, Plaintiffs and important witnesses reside in Arizona, and much material evidence is located here. Given the significance of Arizona's interest in providing a forum and Plaintiffs' similar interest, Defendant must demonstrate a very significant burden to avoid litigation here.

Defending this action in Arizona will not create a hardship on Defendant sufficient to outweigh the state's interest in providing a local forum for its citizens and protecting them from defective products. In 1958, the United States Supreme Court noted that as technology has drawn the world markets closer, "progress in communications and transportation has made defense of a suit in a foreign tribunal less burdensome." *Hanson*, 357 U.S. at 251, 78 S.Ct. at 1238. Telephones, facsimile machines, and photocopiers answer the logistical problems as easily for lawsuits pending in Arizona as those anywhere in a world reached by telecommunications satellites. As Defendant has already demonstrated, competent Arizona counsel is available to represent it. Defendant's bur-

---

9. Defendant's Petition for Special Action in the Court of Appeals at 3, contained in its Appendix, asserts as fact that "American trade publications in 1974 simply identified the firearm as an 'Iver Johnson Cattleman' which was 'Imported by Iver Johnson,' making no mention of Uberti." As noted, however, the gun was stamped with both Iver Johnson's and Defendant's names.

**576**

den may be greater defending in Tucson than in Milan, but it is certainly manageable.

Finally, we see no procedural or substantive conflict with Italian law that might arise from resolving this matter in an Arizona court. Indeed, economic treaties such as NAFTA and GATT, designed to secure the future of global commerce and advance internationally-shared social and economic policies, make it reasonable for a plaintiff's home state to exercise jurisdiction over a foreign manufacturer of allegedly defective goods reasonable. *Barone*, 25 F.3d at 615. Nor would holding an Italian manufacturer accountable under Arizona law be an undue burden on Italian–United States relations. Arizona's exercise of jurisdiction over Defendant is reasonable. We therefore find that, on this record, Plaintiffs made a prima facie showing that the trial court had personal jurisdiction over Defendant.

## CONCLUSION

Defendant had sufficient minimum contacts so that due process permits Arizona to exercise personal jurisdiction and require Defendant to answer for the harm its product caused here. Exercising jurisdiction here is fair and reasonable. The trial judge's order denying dismissal is affirmed. If future discovery indicates lack of jurisdiction, the trial court is free, of course, to make the appropriate order. We therefore vacate the court of appeals' opinion and remand this matter to the trial court for further proceedings consistent with this opinion.

MOELLER, V.C.J., and CORCORAN, ZLAKET and MARTONE, JJ., concur.

The Right Honourable the Lord Woolf, Lord of Appeal in Ordinary, sat with the court at oral argument but did not participate in the determination of this matter.