996 P.2d 1254

Lawrence S. ROLLIN, individually; and J. William Mandelbaum and Barbara Mandelbaum, husband and wife; and on behalf of all others similarly situated, Plaintiffs/Appellants,

v.

WILLIAM V. FRANKEL & CO., INC., a New Jersey corporation; Hill, Thompson, Magid & Co., Inc., a New York corporation, Defendants/Appellees.

No. 2 CA–CV 99–0164.

Court of Appeals of Arizona, Division 2, Department A.

March 23, 2000.

Rusing & Lopez, P.L.L.C. By G. Todd Jackson and Laura A. Hubbard, Tucson, and McNamara & Goldsmith, P.C. By Eugene N. Goldsmith, Tucson, Attorneys for Plaintiffs/Appellants.

Snell & Wilmer L.L.P. By Joel P. Hoxie and David E. Rauch, Phoenix and Law Offices of Richard L. Herzfeld By Richard L. Herzfeld, New York, New York, Attorneys for Defendant/Appellee William V. Frankel & Co., Inc.

Osborn Maledon, P.A. By David Rosenbaum and Maureen Beyers, Phoenix and Bingham Dana L.L.P. By Steven W. Hansen and Timothy P. Burke, Boston, Massachusetts, Attorneys for Defendant/Appellee Hill, Thompson, Magid & Co., Inc.

## OPINION

PELANDER, Presiding Judge.

¶ 1 In this putative class action, plaintiffs/appellants Lawrence S. Rollin and J. William and Barbara Mandelbaum appeal from the trial court's order dismissing their complaint against defendants/appellees William V. Frankel & Co. (Frankel) and Hill, Thompson, Magid & Co. (HTM) for lack of personal jurisdiction. We affirm.

## BACKGROUND

¶ 2 This action arises out of the purchase and sale of worthless public stock in a company called Discovery Zone. On July 29, 1997, a bankruptcy court extinguished all of Discovery Zone's publicly owned stock pursuant to a confirmed plan of reorganization under Chapter 11 of the Bankruptcy Code. The Securities and Exchange Commission (SEC) did not suspend trading on that stock, however, until August 1, 1997. In the interim, on July 31, plaintiffs purchased Discovery Zone stock through their brokers in Tucson, Fidelity Investments and Merrill Lynch. Fidelity, through its Boston office, purchased 2,000 shares on Rollin's behalf from Frankel. Through transactions occurring in New York and New Jersey, Merrill Lynch purchased the same number of shares on the Mandelbaums' behalf from HTM.

¶ 3 Plaintiffs, Arizona residents, filed this action against Frankel and HTM, the market makers on the National Association of Securities Dealers Automated Quotation (NASDAQ)[1] system who had sold the Discovery Zone stock to plaintiffs' agents. Plaintiffs brought the action on behalf of themselves and a class of approximately 5,000 similarly situated persons who had purchased Discovery Zone stock from Frankel or HTM on or after July 29, 1997. In their amended complaint, plaintiffs alleged causes of action for rescission, restitution, unjust enrichment, and negligence.

¶ 4 Frankel, a New Jersey corporation with its principal place of business there, and HTM, a New York corporation with its prin-

---

1. A NASDAQ informational bulletin in the record states, in part:

   The Nasdaq Stock Market is the fastest growing major stock market in the world and was the very first electronic-based stock market. More than half of all shares that change hands in the United States each day do so on Nasdaq. Almost 5,400 companies trade their securities on this state-of-the-art market.

   Nasdaq stands apart from the other stock markets through its use of today's information technologies—computers and telecommunications—in place of a traditional trading floor. Some 519 dealers known as Market Makers, representing some of the world's largest securities firms, provide more than 60,000 competing bids to buy, and offers to sell, Nasdaq stocks. This extensive activity is conducted through a vast computer network that displays the best of these quotations to investors in 52 countries.

cipal place of business in New Jersey, moved to dismiss the action for lack of personal jurisdiction pursuant to Rule 12(b)(2), Ariz. R. Civ. P., 16 A.R.S. The trial court granted the motions, and this appeal followed. We have jurisdiction under A.R.S. § 12–2101(D).

## DISCUSSION

■ ¶ 5 We review de novo a trial court's dismissal for lack of personal jurisdiction, viewing the facts in the light most favorable to the plaintiffs. *A. Uberti and C. v. Leonardo,* 181 Ariz. 565, 567, 569, 892 P.2d 1354, 1356, 1358 (1995). Frankel and HTM are securities broker-dealers registered with the SEC and the National Association of Securities Dealers (NASD). Both companies function as market makers on the NASDAQ stock market. Market makers are independent dealers that openly compete with each other for investors' orders in NASDAQ-listed stock by using their own capital to buy and sell NASDAQ securities. Because NASDAQ does not have a traditional trading floor, it relies on the market makers to generate competition and immediate, continuous trading and to ensure liquidity for stocks listed on NASDAQ.

¶ 6 Although market makers operate from individual offices, they conduct much of their activity through a vast computer network, linked by NASDAQ. Market makers provide quotations electronically to the NASDAQ stock exchange. Depending upon the level of NASDAQ work station terminal maintained at their particular office, NASDAQ broker-dealers may then access those quotes and place orders with market makers on behalf of customers located throughout the United States and abroad.[2] Market makers generally do not deal directly with the public, but rather, transact business only with other broker-dealers that are NASDAQ members. Market makers are obligated by the NASD to sell to or buy from any such firm that agrees to the posted price quotes. Thus, the quotes essentially constitute irrevocable offers to sell or buy at the stated prices.

¶ 7 It is undisputed that neither Frankel nor HTM is incorporated; is registered to do business; owns or leases any property; maintains any offices, bank accounts, or telephone listings; or has any employees, agents, or other physical presence in Arizona. As noted in ¶ 2 above, Rollin's purchase of Discovery Zone stock actually occurred between Frankel's New Jersey office and Fidelity's Boston office, and the Mandelbaums' purchase occurred in New Jersey and New York. In addition, plaintiffs' broker/agents acted on behalf of undisclosed principals. That is to say, when a broker-dealer such as Fidelity or Merrill Lynch contacted Frankel or HTM to accept a stock quote, the market maker was not informed whether the purchase order was for the broker-dealer's own account or on behalf of a customer. Thus, Frankel and HTM had no information about the identity or location of broker-dealers' ultimate customers who placed purchase orders with them.

¶ 8 Plaintiffs contend, however, that the "modern realities of electronic commerce" permit Arizona to assert both general and specific jurisdiction over Frankel and HTM because of their unique roles as market makers. Plaintiffs have the burden of " 'mak[ing] a prima facie showing of jurisdiction.' " *Uberti,* 181 Ariz. at 569, 892 P.2d at 1358, *quoting Barone v. Rich Bros. Interstate Display Fireworks Co.,* 25 F.3d 610, 611 (8th Cir.1994). *See also Macpherson v. Taglione,* 158 Ariz. 309, 312, 762 P.2d 596, 599 (App. 1988). Viewing the facts in the light most favorable to plaintiffs, we cannot say they met their burden of establishing either general or specific jurisdiction here.

## A. General Jurisdiction

■ ¶ 9 "General jurisdiction subjects the defendant to suit on virtually any claim, '[e]ven when the cause of action does not arise out of or relate to the [defendant's] activities in the forum State.' " *Batton v.*

**2.** Quotations for certain types of traded stock (NASDAQ NMS, Small Cap, or Bulletin Board) are available on NASDAQ terminals to broker-dealers that are members of NASDAQ, while quotes for other types of stock ("pink sheet") are listed on printed sheets that are disseminated on a weekly basis to member broker-dealers that are paid subscribers to that service.

*Tennessee Farmers Mut. Ins. Co.,* 153 Ariz. 268, 270, 736 P.2d 2, 4 (1987), *quoting Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404, 411 (1984) (brackets in *Batton*). General jurisdiction applies only if "the defendant has 'substantial' or 'continuous and systematic' contacts with the forum state." *Batton,* 153 Ariz. at 270, 736 P.2d at 4, *quoting in part Helicopteros,* 466 U.S. at 416, 104 S.Ct. at 1873, 80 L.Ed.2d at 412. *See also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 487, 105 S.Ct. 2174, 2184, 2190, 85 L.Ed.2d 528, 542, 550 (1985). "[M]ere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion" of general jurisdiction. *Helicopteros,* 466 U.S. at 418, 104 S.Ct. at 1874, 80 L.Ed.2d at 413.

■ ¶ 10 Plaintiffs contend Frankel and HTM have "conducted continuous and systematic business with [Arizona] through participation in the electronic NASDAQ stock market." To support that claim of general jurisdiction, plaintiffs point to the fact that, "[i]n 1997, HTM conducted over $14 million worth of trades with twelve broker dealers located in Arizona ... [and] Frankel, in one month alone, [July 1997,] conducted almost $13,000 worth of trades with broker-dealers located in Arizona."

¶ 11 Plaintiffs essentially concede that none of the traditional indicia of general jurisdiction is present here. *See Helicopteros,* 466 U.S. at 416–18, 104 S.Ct. at 1873–74, 80 L.Ed.2d at 412–14. Other than the gross value of Frankel's and HTM's transactions during certain time frames with broker-dealers that had trading desks in Arizona, the record reflects no other activities that could be characterized as conducting business in Arizona, directly or indirectly. In addition, most of HTM's sales transactions to which plaintiffs refer actually were conducted outside Arizona with broker-dealers that maintained trading desks in Arizona and elsewhere. And, HTM's total 1997–98 sales to broker-dealers with trading desks in Arizona, both in terms of volume and monetary receipts, constituted less than one percent of HTM's total business for those years. Similarly, of the 19,659 trades that Frankel entered into in July 1997, only seven sales and no purchases were made with brokers domiciled in Arizona. During the relevant time frame, July 29 through August 1, 1997, HTM did not sell any Discovery Zone stock to a broker-dealer that maintained a trading desk in Arizona. And, Frankel made no trades for Discovery Zone stock in Arizona at any time.

¶ 12 In support of their general jurisdiction argument, plaintiffs cite cases that considered a defendant's high value of transactions or Internet solicitation in the forum state. Those cases, however, primarily addressed a state's power to exercise specific jurisdiction and involved intentional solicitation in the forum state not present here. *See, e.g., Inset Sys., Inc., v. Instruction Set, Inc.,* 937 F.Supp. 161 (D.Conn.1996); *Raymond E. Danto, Assoc., Inc. v. Arthur D. Little, Inc.,* 316 F.Supp. 1350 (E.D.Mich.1970); *Maritz, Inc. v. Cybergold, Inc.,* 947 F.Supp. 1328 (E.D.Mo.1996). On this record, we cannot say Frankel or HTM had substantial or systematic and continuous contacts with Arizona so as to warrant the assertion of general jurisdiction by Arizona courts. *See International Shoe Co. v. Washington,* 326 U.S. 310, 317, 66 S.Ct. 154, 159, 90 L.Ed. 95, 102–03 (1945) ("[C]onduct of single or isolated items of activities in a state in the corporation's behalf are not enough to subject it to suit on causes of action unconnected with the activities there.").

### B. Specific Jurisdiction

■ ¶ 13 We also conclude that plaintiffs have not made a prima facie showing of specific jurisdiction. Arizona courts may exercise specific jurisdiction over nonresident defendants "to the maximum extent allowed by the federal constitution." *Uberti,* 181 Ariz. at 569, 892 P.2d at 1358; see Ariz. R. Civ. P. 4.2(a). To comply with federal due process standards, the nonresident defendant must have sufficient minimum contacts with the forum state, and the assertion of jurisdiction must be reasonable. *Uberti,* 181 Ariz. at 569, 892 P.2d at 1358. A finding of minimum contacts " 'must come about by *an action of the defendant purposefully directed toward the forum State.*' " *Uberti,* 181 Ariz. at 570,

892 P.2d at 1359, *quoting Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 112, 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92, 104 (1987). *See also Burger King,* 471 U.S. at 474–75, 105 S.Ct. at 2183, 85 L.Ed.2d at 542; *Hoskinson v. State of California,* 168 Ariz. 250, 253, 812 P.2d 1068, 1071 (App.1990) ("The defendant must also have *purposefully* directed his conduct or activities at the forum state."). This "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts" with the forum state. *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183, 85 L.Ed.2d at 542.

¶ 14 United States Supreme Court precedent also requires a plaintiff's claim to arise out of or relate to the defendant's forum activities before the forum state may exercise specific jurisdiction over the defendant. *See, e.g., Burger King,* 471 U.S. at 472, 105 S.Ct. at 2182, 85 L.Ed.2d. at 541; *Helicopteros,* 466 U.S. at 414, 104 S.Ct. at 1872, 80 L.Ed.2d at 411. *See also Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1320 (9th Cir.1998); *Armstrong v. Aramco Serv. Co.,* 155 Ariz. 345, 349, 746 P.2d 917, 921 (App.1987). If the nonresident defendant's forum-related activities "are not sufficiently connected for [the] court to conclude that the plaintiff's claim arises out of" those activities, dismissal is warranted. *Westphal v. Mace,* 671 F.Supp. 665, 668 (D.Ariz.1987).

¶ 15 Plaintiffs assert that Frankel and HTM had sufficient minimum contacts with Arizona and, for that matter, with all fifty states, because they "purposefully availed themselves of all the benefits of [NASDAQ's] system ... and entered into contracts daily to sell stock to purchasers throughout the country, including Arizona." That electronic communications system, plaintiffs argue, "constantly receives and reports the prices at which market makers are willing to sell their securities to brokers and agents located throughout the country." Plaintiffs further contend that "Frankel and HTM entered into transactions with the Plaintiffs' purchasing agents, Fidelity and Merrill Lynch, knowing full well that these national brokerages had offices and thousands of clients throughout the United States."

¶ 16 Plaintiffs do not allege and the record does not reflect, however, that Frankel and HTM " 'purposefully avail[ed themselves] of the privilege of conducting activities within [Arizona],' " rather than of just the electronic medium to display their quotes. *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183, 85 L.Ed.2d at 542, *quoting Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283, 1298 (1958). Plaintiffs made no showing that Frankel or HTM closed sales, performed services, or conducted any other activities in Arizona. Nor does the record reflect that Frankel and HTM availed themselves of any privileges or benefits of Arizona law, solicited business in Arizona through sales personnel or advertising "reasonably calculated to reach" Arizona, regularly sold securities to Arizona residents, or "indirectly, through others, serve[d] or [sought] to serve the [Arizona] market." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 295, 100 S.Ct. 559, 566, 62 L.Ed.2d 490, 500 (1980). And, in this particular case, no "money changed hands" in Arizona, nor did Frankel or HTM deliver any stock here. *Meyers v. Hamilton Corp.,* 143 Ariz. 249, 253, 693 P.2d 904, 908 (1984).

¶ 17 The record also reflects that all of Frankel's business and "[a]lmost all" (approximately 99%) of HTM's business consisted of transactions with other broker-dealers, not the general public. Thus, Frankel's and HTM's clientele consisted of a closed, limited network of qualified firms with which they did business. Although that business was conducted through an automated, "virtual" stock market rather than in person on a stock exchange trading floor, plaintiffs have not shown that those different methods of operation are jurisdictionally significant, nor have they cited any cases holding a stock exchange floor broker or a NASDAQ market maker subject to specific jurisdiction in the forum state of the ultimate stock purchaser based solely on the purchaser's residence there or on the mode by which the stock transaction was consummated.

¶ 18 Moreover, as noted in ¶ 6, Frankel and HTM were obligated to sell to or buy from any qualified broker-dealer that agreed to their posted prices; thus, they had no

clear incentive to direct their quotes toward any specific buyers in any particular state. And, as discussed in ¶¶ 7 and 12, Frankel and HTM had no way of identifying ultimate purchasers whom the broker-dealers might have represented. The transactions essentially were anonymous.

¶ 19 According to plaintiffs, specific jurisdiction exists because Frankel and HTM "posted stock quotes ... that they knew and intended to be accessed by over 5,000 broker-dealers located ... and representing buyers throughout the United States, including Arizona," and "intentionally offer[ed] their product to Arizona residents ... by electronically transmitting their asking price to and accepting orders from the computer screens of the brokers located throughout the state." That Frankel's and HTM's quotes were accessible to broker-dealers around the country who might then purchase and distribute stock to ultimate customers anywhere, however, does not equate to a purposeful, focused distribution of their stock quotes to customers in Arizona or to any other particular state. But even if it did, the record does not reflect that Frankel or HTM purposefully distributed stock, particularly Discovery Zone stock, to plaintiffs or to any other Arizona residents.

¶ 20 As in their general jurisdiction argument, plaintiffs also maintain that the high monetary value of Frankel's and HTM's transactions in 1997 with broker-dealers that had trading desks in Arizona demonstrates "deliberate and repeated contacts" so as to authorize specific jurisdiction. What plaintiffs overlook, however, is that their purchases of Discovery Zone stock did not arise out of or relate to Frankel's or HTM's prior Arizona contacts. Absent that nexus, specific jurisdiction is lacking. *See Helicopteros,* 466 U.S. at 414, 104 S.Ct. at 1872, 80 L.Ed.2d at 411; *Armstrong,* 155 Ariz. at 349, 746 P.2d at 921.

¶ 21 We cannot accept plaintiffs' broad, general proposition that, "when an entity intentionally uses an electronic medium to reach beyond its boundaries to conduct business, the exercise of specific jurisdiction is appropriate." The numerous cases plaintiffs cite to support that assertion address Internet websites. But the record here neither reflects nor do plaintiffs explain how posting quotes on NASDAQ's system equates to the type of Internet use at issue in those cases.

¶ 22 Even assuming NASDAQ postings and Internet websites are analogous, however, we find plaintiffs' cited cases inapposite. In those cases, the courts found that the nonresident defendant had purposefully availed itself of the forum state based on specific contacts or intentional, directed solicitation in that state. For example, in *EDIAS Software International, L.L.C. v. BASIS International Ltd.,* 947 F.Supp. 413, 421 (D.Ariz.1996), the court concluded that a nonresident software producer had purposefully availed itself of the privilege of conducting activities in Arizona based on "[t]he visits [to Arizona] and the many phone, fax and e-mail communications that [the company] made to Arizona, in addition to the invoices that [it] sent to Arizona, and the allegedly defamatory statements" about the plaintiff, an Arizona company, which it had posted on its web page. Similarly, in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119, 1126 (W.D.Pa.1997), the court found purposeful availment based on a California computer news service's having "repeatedly and consciously chose[n] to process Pennsylvania residents' applications and to assign them passwords [and] ... [having known] that the result of th[ose] contracts would be the transmission of electronic messages into Pennsylvania." The facts in those cases bear no meaningful resemblance to those presented here.[3]

---

**3.** We find the other Internet-related cases that plaintiffs cite similarly unpersuasive. *See, e.g., CompuServe, Inc. v. Patterson,* 89 F.3d 1257, 1264 (6th Cir.1996) (purposeful availment found based on nonresident defendant's choosing to transmit software and advertising and selling product through plaintiff's system in forum state); *Cody v. Ward,* 954 F.Supp. 43, 44 (D.Conn.1997) ("[A] nonresident's transmission

of fraudulent misrepresentations to a Connecticut resident by telephone and electronic mail for the purpose of inducing him to buy and hold securities renders [him] subject to suit in Connecticut."); *Inset Sys., Inc. v. Instruction Set, Inc.,* 937 F.Supp. 161, 165 (D.Conn.1996) (nonresident corporation purposefully availed itself of forum state by "direct[ing] its advertising activities via the Internet and its toll-free number

¶ 23 Other cases suggest that use of the Internet, without more, does not constitute purposeful availment for specific jurisdiction purposes. Courts in such cases have found personal jurisdiction lacking when a nonresident defendant's Internet connection to the forum state is passive and non-interactive. For example, in *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 419 (9th Cir.1997), the Ninth Circuit, applying Arizona law, held that Arizona did not have jurisdiction over a Florida company whose only contact with Arizona was a minimally interactive web page that was "limited to receiving the browser's name and address and an indication of interest—signing up for the service [was] not an option, nor did anyone from Arizona do so[, and] [n]o money changed hands on the Internet from (or through) Arizona." The court reasoned that basing personal jurisdiction "on an essentially passive web page advertisement" "would not comport with traditional notions of what qualifies as purposeful activity invoking the benefits and protections of the forum state." *Id.* at 420.

¶ 24 Similarly, Frankel's and HTM's electronic quotes, which are not even accessible to the general public, do not constitute purposeful availment. *See Bensusan Restaurant Corp. v. King*, 937 F.Supp. 295, 301 (S.D.N.Y.1996), *aff'd*, 126 F.3d 25 (2d Cir. 1997) ("Creating a[web] site, like placing a product into the stream of commerce, may be felt nationwide—or even worldwide—but, without more, it is not an act purposefully directed toward [a] forum state."); *E–Data Corp. v. Micropatent Corp.*, 989 F.Supp. 173, 177 (D.Conn.1997) (that nonresident's "Internet advertising had the potential to reach and solicit Connecticut residents" insufficient to confer jurisdiction there). To the extent the Internet cases are analogous to the situation presented here, we find Frankel's and HTM's automated listing of quotes more akin to passive Internet activity than to interactive conduct, open solicitation, or "doing business" on the Internet. *See Zippo Mfg.*, 952

F.Supp. at 1124. *See generally* Steven Betensky, *Jurisdiction and the Internet*, 19 Pace L.Rev. 1 (1998); Andrew E. Costa, *Minimum Contacts in Cyberspace: A Taxonomy of the Case Law*, 35 Hous. L.Rev. 453 (1998).

¶ 25 As best we can determine from the record, Frankel's and HTM's connection with Arizona was limited to the chance that a broker-dealer located anywhere in the country *might* have accessed their quote for a particular stock on NASDAQ's computer system and, finding the quote satisfactory, *might* have purchased some of that stock from them for an Arizona customer. As that scenario reflects, Frankel and HTM had no way of controlling to whom they sold stock or of knowing what customer base their stock purchasers represented. In those respects, Frankel's and HTM's positions were not unlike that of the component manufacturer in *Asahi*, which "had little control over the final destination of its products once they were delivered into the stream of commerce." *Uberti*, 181 Ariz. at 572, 892 P.2d at 1361.

■ ¶ 26 In essence, plaintiffs merely have established that it was foreseeable to Frankel and HTM that the stock for which they served as market makers would eventually end up in the hands of Arizona customers. But "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World–Wide Volkswagen*, 444 U.S. at 295, 100 S.Ct. at 566, 62 L.Ed.2d at 500. *See also Asahi*; *Batton*. Foreseeability is only relevant if a nonresident defendant has made knowing and intentional connections with the forum state such that it would have "clear notice that it [would be] subject to suit there." *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567, 62 L.Ed.2d at 501. Frankel's and HTM's connection with Arizona customers is, at best, attenuated and, arguably, just the product of random chance. Because the record does not reflect that Frankel or HTM made knowing and purposeful connec-

toward ... all states"); *Digital Equip. Corp. v. AltaVista Tech., Inc.*, 960 F.Supp. 456, 470 (D.Mass.1997) (defendant purposefully availed itself of Massachusetts by posting trademark-infringing website that mirrored that of Massachusetts company and "that plainly would attract

Massachusetts residents"); *TELCO Communications v. An Apple A Day*, 977 F.Supp. 404, 407 (E.D.Va.1997) (website advertisement, solicitation, and press releases in forum state sufficient minimum contacts for specific jurisdiction).

tions with Arizona, the trial court properly granted their motions to dismiss. *See Albany Ins. Co. v. Rose–Tillmann, Inc.*, 883 F.Supp. 1459 (D.Or.1995) (specific jurisdiction lacking over nonresident wholesale insurance broker that assisted insured's agent in procuring insurance coverage for insured/resident of forum state, when wholesale broker had no direct contact with insured, insured's agent contacted wholesale broker, and all dealings between broker and insured's agent occurred outside forum state).

¶ 27 *Uberti* does not compel a contrary result. That case involved personal jurisdiction over a foreign manufacturer that had "made ... guns for the American market" and, specifically, for a "distributor known to Defendant as an American company serving the American market." 181 Ariz. at 571, 572, 892 P.2d at 1360, 1361. The distributor had advertised the defendant's product in national gun magazines and in the defendant's catalog disseminated in the United States. *Id.* at 569, 574–75, 892 P.2d at 1358, 1363–64. The court noted that the defendant had "not only placed a *finished* product into a trade stream of its own choosing but chose a distributor intending to penetrate the American market." *Id.* at 572, 892 P.2d at 1361. In addition, the record in *Uberti* supported the trial court's finding there that the defendant's "'guns [were] designed for appeal to the western United States consumers.'" *Id.* at 572–73, 892 P.2d at 1361–62.

¶ 28 Unlike the foreign manufacturer in *Uberti* that had voluntarily and specifically designed and directed its product for distribution in the western United States, including Arizona, the record here reflects no similar activity by Frankel or HTM focused on a particular region or state. Indeed, Frankel and HTM had no means of blocking access to their quotes by particular broker-dealers or in certain geographic regions. Again, NASD rules obligated the market makers to sell to or buy from any NASD member firm that agreed to their posted prices. *See* ¶ 6.

¶ 29 Even if Frankel's and HTM's automated price quotes constitute a "product" or "solicitation," as plaintiffs argue, nothing in this record suggests that Frankel or HTM

engaged in the type of conduct deemed significant in *Uberti*: "'designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as a sales agent in the forum State.'" 181 Ariz. at 573, 892 P.2d at 1362, *quoting Asahi*, 480 U.S. at 112, 107 S.Ct. at 1032, 94 L.Ed.2d at 104 (emphasis added in *Uberti*). In addition, neither Frankel nor HTM directed or was even aware of the sale of Discovery Zone stock to plaintiffs or any other Arizonans. Rather, plaintiffs' agents contacted Frankel and HTM in New Jersey to purchase the stock on behalf of undisclosed principals, and the purchase transactions actually occurred in Massachusetts and New York, not Arizona.

¶ 30 Dealing with a foreign manufacturer in a defective product case, the court in *Uberti* clearly was concerned with the notion that "no individual state could assert jurisdiction over Defendant simply because Defendant did not target a particular state or group of states but instead intended to sell its product to all of America." 181 Ariz. at 573, 892 P.2d at 1362. No such concerns exist here. Indeed, plaintiffs have filed a separate action in New York against Frankel and HTM, in which neither has challenged personal jurisdiction. Viewed in context, the broad statements in *Uberti* that "it [is] enough to show that Defendant intended to market it[s] [product] in any state, group of states, or all states" and that "[a]n intent to sell across America is enough" do not mandate a finding of specific jurisdiction in this case. *Id.*

¶ 31 Finally, we find the other Arizona decisions upon which plaintiffs rely distinguishable. *See DeMont v. DeFrantz*, 303 Ariz. Adv. Rep. 10, ¶ 14, 1999 WL 676218 (Ct.App. August 27, 1999), review granted, (Ariz. Feb. 8, 2000) (No. CV–99–0366–PR) (plaintiff made prima facie showing that nonresident defendant "knew her [allegedly defamatory] statements ... would injure [the plaintiff] and knew he would feel the effects of that injury in Arizona"); *Williams v. Lakeview Co.*, 195 Ariz. 468, ¶ 14, 990 P.2d

669, ¶ 14 (App.1999), review granted, (Ariz. Jan. 4, 2000) (No. CV–99–0364–PR) (nonresident casino purposefully and voluntarily contacted Arizona through advertising in monthly newspaper and mailing between fifty and one hundred brochures to Arizona tour bus companies offering commissions to operators based on time parked at casino); *Macpherson,* 158 Ariz. at 312, 762 P.2d at 599 ("no doubt that [nonresident defendant] was soliciting business in Arizona"). None of those cases supports a finding of specific jurisdiction here. Because plaintiffs failed to show that Frankel or HTM purposefully established minimum contacts in Arizona out of which plaintiffs' claims arise, the "constitutional touchstone" for personal jurisdiction, *Burger King,* 471 U.S. at 474, 105 S.Ct. at 2183, 85 L.Ed.2d at 542, the trial court properly dismissed the action.

¶ 32 Affirmed.

CONCURRING: WILLIAM E. DRUKE, Judge, and M. JAN FLÓREZ, Judge.