160 P.3d 679

In the Matter of the ESTATE OF Kathryn Pabst RODRIGUEZ aka Kathryn Audrey PABST, Deceased.

U.S. Bank, N.A., Trustee and Special Administrator of the Estate of Kathryn Pabst Rodriguez aka Kathryn Audrey Pabst, Deceased; Joseph Pabst and Lorna Pabst de Acosta, surviving siblings of the Deceased, Petitioners/Appellees,

v.

Mauro Alfredo Rodriguez Garcia ("Mauro Rodriguez"), Respondent/Appellant.

No. 1 CA–CV 06–0383.

Court of Appeals of Arizona, Division 1, Department B.

June 14, 2007.

Fennemore Craig PC By Roger T. Hargrove, Susan M. Ciupak, Phoenix, Attorneys for Petitioners/Appellees U.S. Bank NA.

Titus Brueckner & Berry PC By John R. Tellier, David A. Fitzgerald, Scottsdale, Attorneys for Petitioners/Appellees Pabst.

WaterFall Economidis Caldwell Hanshaw & Villamana PC By D. Michael Mandig, Jill

D. Wiley, Tucson, Attorneys for Respondent/Appellant.

## OPINION

NORRIS, Presiding Judge.

¶1 Respondent/Appellant Mauro Rodriguez ("Mauro") appeals from the probate court's decision granting summary judgment to Petitioners/Appellees Joseph Pabst; Lorna Pabst de Acosta; and U.S. Bank, N.A., the Trustee and special administrator of the estate of Kathryn Pabst Rodriguez ("Kathryn"). The court ruled Arizona's "revocation by divorce" statute, Arizona Revised Statutes ("A.R.S.") section 14–2804 (2005), prevented Mauro from taking under Kathryn's will and trust because Mauro was still married when he married Kathryn. For the following reasons, we affirm the probate court's decisions applying Arizona law and finding subject matter and personal jurisdiction, but reverse the court's ruling that A.R.S. § 14–2804 revoked Kathryn's dispositions to Mauro.

## FACTS AND PROCEDURAL BACKGROUND

¶2 Kathryn died in Arizona on October 14, 2004, leaving a sizable estate with assets in the United States and Mexico. Approximately 21 months earlier, on January 17, 2003, Kathryn executed a will. After disposing of specific personal property, her will gave the remainder of the estate to the Trustee of the Kathryn Pabst Rodriguez trust dated November 6, 2000, as amended in its entirety on January 17, 2003, to be distributed according to its terms. Kathryn stated she was Mauro's wife in both her will and trust; and executed both documents in Arizona.

¶3 Under the trust, excluding certain specific gifts, the Trustee was to divide the estate into two separate trusts, a qualified trust and a bypass trust. The qualified trust was to be funded with the minimum amount necessary to be deducted from Kathryn's estate as a marital deduction to eliminate or minimize federal estate tax. The Trustee was directed to distribute all of the net income earned by the qualified trust to Mauro during his life. The Trustee was also directed to distribute the principal of the qualified trust to Mauro upon his request. The bypass trust was to be funded with the balance of Kathryn's estate and was to be distributed to Mauro outright.

¶4 Kathryn selected Arizona law to "govern" the validity and interpretation of the trust. By its express terms, the trust became irrevocable upon Kathryn's death. Kathryn appointed U.S. Bank to serve as her personal representative and as her successor Trustee.

¶5 In March 2005, the probate court appointed U.S. Bank to act as a special administrator pending its appointment as personal representative. Subsequently, U.S. Bank filed a petition for the determination of heirs and beneficiaries of the trust, and asked the probate court to decide whether Mauro was disqualified as a beneficiary under the will and trust pursuant to A.R.S. § 14–2804 because at the time he married Kathryn, he was still married to someone else. That statute provides, generally, that divorce or annulment of marriage, including a declaration of invalidity, revokes any revocable disposition of property made by the divorced person to the former spouse. A.R.S. § 14–2804(A), (I)(2).

¶6 Joseph Pabst, Kathryn's brother, then filed with the probate court a petition for an order disinheriting Mauro. Joseph's petition asserted Mauro should be disinherited pursuant to A.R.S. § 14–2804. Joseph also contended Mauro should be disinherited because his marriage to Kathryn was fraudulent and because he had exploited Kathryn, who, Joseph asserted, was a vulnerable adult under A.R.S. §§ 46–451 to –457 (2005). Lorna Pabst de Acosta, Kathryn's sister, joined in Joseph's petition.

¶7 Mauro responded to the petitions, admitted he had been married at the time of his marriage to Kathryn, and acknowledged that his marriage to his former wife had not been dissolved until February 1989, two months after he had married Kathryn (on December 28, 1988) in Prescott, Arizona. He also raised several affirmative defenses, including lack of personal jurisdiction, and he chal-

lenged the subject matter jurisdiction of the probate court to determine the validity of his marriage to Kathryn.

¶ 8 Kathryn's brother and sister ("Siblings") then moved for judgment on the pleadings, or alternatively, for partial summary judgment on their petition to disinherit Mauro. U.S. Bank also moved for summary judgment on its petition for a determination of heirs and beneficiaries, specifically regarding the application of A.R.S. § 14–2804.

¶ 9 Mauro responded to the motions, and cross-moved for summary judgment. He argued, in part, that Kathryn had never been domiciled in Arizona, that "serious questions" existed regarding the authority of the probate court to address the validity of his marriage to Kathryn, and that A.R.S. § 14–2804 only revoked revocable dispositions and was inapplicable because Kathryn's trust had become irrevocable when she died.

¶ 10 Mauro also moved to dismiss, in part. He asserted the court lacked personal jurisdiction over him and did not have subject matter jurisdiction to decide whether his marriage to Kathryn was valid.[1] Mauro acknowledged, however, that the probate court had subject matter jurisdiction to address other trust administrative issues.[2] The probate court denied Mauro's motion to dismiss. It stated:

But I do think that this Court has the jurisdiction. This was a marriage that was entered into in Arizona, a marriage license in Arizona. The parties were actually physically present in Arizona and the question is was it valid from day one. And so I think that this Court is appropriate to do so.

I do—there is a lengthy filing in this file about the service of process on Mr. Rodriguez and whether that is sufficient for—to establish personal jurisdiction over Mr. Rodriguez. But that fact that he has appeared through Counsel and has asked for various forms of affirmative relief, I do

believe that I have the personal jurisdiction over him to determine the marriage issue.

And certainly there is in rem jurisdiction to determine issues related to Arizona assets.

¶ 11 Applying Arizona law, the court granted the motions filed by the Siblings and U.S. Bank and, accordingly, denied Mauro's cross-motion for summary judgment. The court held Mauro's marriage to Kathryn was void *ab initio* because Mauro was still married when he married Kathryn. It ruled that its decision regarding the invalidity of the marriage constituted a declaration of invalidity under A.R.S. § 14–2804, and it rejected Mauro's argument that the statute was inapplicable because the dispositions to him had become irrevocable upon Kathryn's death:

If the Court takes a hypertechnical approach to the statute, the Court would conclude that the declaration of invalidity is occurring now (with this ruling) and that, at this time, Kathryn's dispositions to Mauro are no longer "revocable." Therefore, the dispositions would not be revoked by the fact of the void marriage. This is the result advocated by Mauro. The Court finds, however, that this result is contrary to legislative intent. Further, when the Court considers that had the marriage been declared void even one day prior to Kathryn's death, Kathryn's dispositions to Mauro would unquestionably have been revoked—even if, say, Kathryn lacked capacity to expressly override the revocation due to illness—the Court finds that the result advocated by Mauro is not sensible.

. . . .

Here, Arizona's Constitution unambiguously establishes a strong public policy against bigamous marriage: they "are forever prohibited." Ariz. Const. Art. 20 par. 2. Additionally, it is clear that the legislature in enacting A.R.S. § 14–2804

---

1. Mauro also argued the court lacked subject matter jurisdiction to decide ownership of Kathryn's real property in Mexico. This issue is not before us, and we express no opinion on it.

2. Indeed, Mauro affirmatively asked the court to adjudicate the Trust administrative issues not covered by his objections. He also agreed that if the court rejected U.S. Bank's and the Siblings' A.R.S. § 14–2804 argument, it would have jurisdiction to enforce Kathryn's will and trust.

intended to create a presumption that Kathryn would not have wanted her estate to go to Mauro if they were not legally married. It is equally clear that the drafters of A.R.S. § 14–2804 (our legislature—or even the drafters of the Uniform Probate Code, from which the statute was adopted) did not anticipate the unique situation that has been presented to this Court. If a strict construction of the statute is utilized to now allow a disposition to Mauro that would have been disallowed if a Court declared his marriage void at any time prior to Kathryn's death, the result is absurd and in contravention of the legislative purpose. Mauro should not benefit from the fact that his bigamous marriage, which is both void and prohibited, did not come to the attention of the Court until after the death of the woman to whom he was never legally married. Therefore, the Court concludes that A.R.S. § 14–2804 does operate to revoke dispositions to Mauro made in Kathryn's Trust or 1993 Will.

¶ 12 The court entered judgment in favor of U.S. Bank and the Siblings. Mauro timely appealed. This court has jurisdiction pursuant to A.R.S. § 12–2101(J) (2003).

## DISCUSSION[3]

### A. Territorial, Jurisdictional, and Related Issues

¶ 13 On appeal, as he did in the probate court, Mauro raises a number of arguments challenging the power and authority of the probate court to decide the validity of his marriage to Kathryn. None of his arguments are persuasive and the probate court appropriately rejected them.

■ ¶ 14 First, Mauro contests the territorial application of Arizona's probate code, asserting it is inapplicable because Kathryn was not domiciled in Arizona—an assertion the Siblings and U.S. Bank dispute.

¶ 15 Arizona Revised Statute § 14–1301 (2005) deals with the territorial application of Arizona's probate code. It states that the probate statutes apply to:

    1. The affairs and estates of decedents . . . domiciled in this state.

    2. The property of nonresidents located in this state or property coming into the control of a fiduciary who is subject to the laws of this state.

    . . . .

    4. Multiple-party accounts in this state.

    5. Trusts subject to administration in this state.

¶ 16 Although the parties dispute whether Kathryn was domiciled in Arizona, and thus whether subsection 1 of the statute applies, U.S. Bank, Kathryn's successor Trustee, subjected itself to the laws of this state by initiating proceedings in the probate court, and, thus, triggered the applicability of subsection 2 of the statute. Accordingly, Arizona's probate code is applicable to property coming into U.S. Bank's control as Trustee.

■ ¶ 17 Next, asserting neither he nor Kathryn were domiciled in Arizona, Mauro argues the probate court was without subject matter jurisdiction to adjudicate the validity of the marriage. In making this argument, he relies on Arizona statutes that prohibit an Arizona court from dissolving or annulling a marriage unless one of the spouses is domiciled in this state. See A.R.S. §§ 25–302(A) (2005) (annulment) and 25–312(1) (2005) (dissolution).

¶ 18 This is not, however, a divorce or annulment proceeding; and the probate court did not grant a divorce or annulment. Rather, the court determined the validity of Mauro's marriage to Kathryn pursuant to the court's jurisdiction to determine "all subject matter relating to" trusts and estates of decedents, A.R.S. §§ 14–1302(A)(1) and (3)

---

**3.** Mauro's arguments on appeal arise, in part, out of the probate court's denial of his motion to dismiss and, in part, out of rulings made by the probate court in resolving the parties' cross-motions for summary judgment. All of Mauro's arguments present issues we review de novo. See, e.g., Roosevelt Elementary Sch. Dist. No. 66 v. State, 205 Ariz. 584, 589, ¶ 24, 74 P.3d 258, 263

(App.2003)(appellate court reviews de novo issues of law involving constitutional and statutory interpretation); Rollin v. William V. Frankel & Co., Inc., 196 Ariz. 350, 352, ¶ 5, 996 P.2d 1254, 1256 (App.2000)(appellate court reviews de novo trial court's dismissal for lack of personal jurisdiction, viewing facts in light most favorable to plaintiff).

(2005), and to ascertain trust beneficiaries, or to "determine any question arising in the administration or distribution of any trust...." A.R.S. § 14–7201(A)(3) (2005). Here, to determine the heirs and beneficiaries of Kathryn's will and trust, the probate court was required to determine the validity of Kathryn's marriage to Mauro.

¶ 19 Mauro also asserts the court lacked personal jurisdiction over him. But, Mauro obtained a marriage license in Arizona and married Kathryn in Arizona; and the issue at the core of this case is whether his Arizona marriage to Kathryn was valid under Arizona law, and if it was not, whether its invalidity triggered the applicability of A.R.S. § 14–2804. Under these circumstances, the probate court had "specific" jurisdiction over Mauro. *Williams v. Lakeview Co.,* 199 Ariz. 1, 3, ¶ 7, 13 P.3d 280, 282 (2000).

¶ 20 Relying on *Donlann v. Macgurn,* 203 Ariz. 380, 55 P.3d 74 (App.2002), Mauro next argues the probate court should have applied the law of Mexico to determine the validity of the marriage because he and Kathryn were domiciled in Mexico, and Mexico thus had the most significant relationship to the two of them and their marriage.

¶ 21 Putting aside the issue of Kathryn's domicile—which, as noted above, the parties dispute—and even if we assume Mauro and Kathryn were domiciled in Mexico when Kathryn died, Arizona does not determine the validity of a marriage based on the law of the jurisdiction with the most significant relationship. "Unless strong public policy exceptions require otherwise, the validity of a marriage is generally determined by the law of the place of marriage." *Id.* at 383, ¶ 12, 55 P.3d at 77; *accord Cook v. Cook,* 209 Ariz. 487, 491–92, ¶ 16, 104 P.3d 857, 861–62 (App. 2005). In considering whether a public policy exception applies, Arizona looks to its own public policy and not the public policy of another jurisdiction, regardless of whether the other jurisdiction has a more significant relationship to the marriage. *Cook,* 209 Ariz.

at 492, ¶ 17, 104 P.3d at 862. *Donlann* does not hold otherwise.

¶ 22 In *Donlann,* two Arizona residents married in Mexico. 203 Ariz. at 382, ¶ 2, 55 P.3d at 76. The ceremony was invalid under Mexican law. *Id.* at 383, ¶ 14, 55 P.3d at 77. Applying Arizona statutory law, this court held the marriage was valid because it would have been valid if contracted in Arizona. *Id.* at 385, ¶¶ 22–23, 55 P.3d at 79.

¶ 23 *Donlann* does not support an argument that Arizona should apply Mexican law to validate a marriage invalid in Arizona that is contrary to Arizona public policy. Mauro has offered no Arizona public-policy grounds to warrant an exception to the rule that the law of the place where the marriage was contracted controls. Consequently, Arizona law, not Mexican law, applies to this issue, and under Arizona law, Mauro's marriage to Kathryn was void *ab initio,* as the probate court held. Ariz. Const. art. 20, para. 2; *In re Milliman's Estate,* 101 Ariz. 54, 58, 415 P.2d 877, 882 (1966).[4]

¶ 24 Finally, Mauro argues that applying the substantive law of Arizona to determine the validity of his marriage violates due process. He contends that because he and Kathryn lived as husband and wife in Mexico for 16 years, their expectations are rooted in the law of Mexico, such that application of Arizona law to erase their marriage violates due process.

¶ 25 To constitutionally apply its substantive law to a matter, a state must have a significant contact or significant aggregation of contacts creating a state interest, so that the application of its law is not arbitrary or fundamentally unfair. *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 818, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985)(citing *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 312–13, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981)). Here, Arizona has not just one, but several significant contacts with the claims of the parties and Kathryn's marriage to Mauro.

---

4. Although Mauro challenged the court's authority and application of Arizona law to determine the validity of the marriage, Mauro has not asserted on appeal that the court incorrectly determined that under Arizona law his marriage to Kathryn was void.

¶ 26 Kathryn and Mauro were married in Arizona under the laws of this state, and Arizona has an interest in the application of its own marriage laws. Kathryn executed her trust and will in Arizona and, further, specifically subjected her trust to Arizona law. *See supra* ¶ 3. Although, as Mauro argues, the expectations of the parties are an important factor in evaluating the fairness of applying a given state's law, it is not the controlling factor.[5] Due process is satisfied when, as here, a state has a significant contact or a "significant aggregation of contacts" that give it an interest in applying its law. *Phillips*, 472 U.S. at 818, 105 S.Ct. 2965. The application of Arizona law to decide the validity of Mauro's marriage to Kathryn is therefore not arbitrary or unfair.

### B. Applicability of A.R.S. § 14–2804

¶ 27 Mauro argues that the probate court, after declaring his marriage to Kathryn invalid, improperly applied A.R.S. § 14–2804 to revoke the dispositions to him under Kathryn's will and trust based on that declaration of invalidity. We agree.

¶ 28 "The primary rule of statutory construction is to find and give effect to legislative intent." *Mail Boxes, Etc. U.S.A. v. Indus. Comm'n*, 181 Ariz. 119, 121, 888 P.2d 777, 779 (1995). To that end, we look first to the language of the statute. *Canon Sch. Dist. No. 50 v. W.E.S. Constr. Co.*, 177 Ariz. 526, 529, 869 P.2d 500, 503 (1994). We are bound by legislative definitions of statutory terms. *Walker v. City of Scottsdale*, 163 Ariz. 206, 209, 786 P.2d 1057, 1060 (App. 1989). If the statutory language is unambiguous, we must give effect to the language and do not use other rules of statutory construction in interpreting the statute. *Janson v. Christensen*, 167 Ariz. 470, 471, 808 P.2d 1222, 1223 (1991). Interpretation of a statute is a question of law, which we review de novo. *Schwarz v. City of Glendale*, 190 Ariz. 508, 510, 950 P.2d 167, 169 (App.1997).

¶ 29 Section 14–2804 provides that a "divorce or annulment" automatically rescinds a spouse's pre-divorce or pre-annulment revocable disposition or appointment of property to the former spouse. The statute provides in pertinent part:

A. Except as provided by the express terms of a governing instrument ..., the divorce or annulment of a marriage:

1. Revokes any revocable:

(a) Disposition or appointment of property made by a divorced person to that person's former spouse in a governing instrument and any disposition or appointment created by law or in a governing instrument to a relative of the divorced person's former spouse.

. . . .

E. No change of circumstances other than as described in this section and in § 14–2803 [6] effects a revocation.

"Divorce or annulment" under the statute is defined as:

[A]ny divorce or annulment or any dissolution or declaration of invalidity of a marriage that would exclude the spouse as a surviving spouse within the meaning of § 14–2802 [7] but does not include a decree of separation that does not terminate the status of husband and wife.

A.R.S. § 14–2804(I)(2). A "revocable" disposition is defined as:

[O]ne under which the divorced person, at the time of the divorce or annulment, was alone empowered by law or under the governing instrument to cancel a designation in favor of that person's former spouse or former spouse's relative, ... whether or

---

5. Whether Kathryn "expected" Mexican law to govern the validity of her marriage is debatable. Kathryn maintained her voter's registration, driver's license, and automobile registration in Arizona and was classified as a "non-immigrant visitor" in Mexico.

6. This statute provides that a person who feloniously and intentionally kills the decedent forfeits all benefits with respect to the decedent's estate. A.R.S. § 14–2803 (2005).

7. Section 14–2802 addresses the effect of a divorce or annulment on the status of a surviving spouse. A.R.S. § 14–2802 (2005).

not the divorced person then had the capacity to exercise the power.

A.R.S. § 14–2804(I)(6).

¶ 30 Arizona is not the only state to have enacted what is often referred to as a "revocation by divorce" statute. *See In re Estate of Lamparella,* 210 Ariz. 246, 252, ¶ 34, 109 P.3d 959, 965 (App.2005). As recognized in *In re Estate of Dobert,* 192 Ariz. 248, 254, ¶ 24, 963 P.2d 327, 333 (App.1998), revocation by divorce statutes rest on the belief that, after a divorce, neither spouse will usually wish to leave any part of his or her estate to the other:

> The statutes anticipate that, upon undergoing a fundamental change in family composition such as ... divorce ... [the divorced party] would most likely intend to provide for their new family members, and/or revoke prior provisions made for their ex-spouses. The statutes also anticipate that [the divorced spouse] will often fail to so provide and revoke, not out of conscious intent, but simply from a lack of attentiveness. By automatically revoking prior beneficiary-designations upon a change in family composition, and by substituting statutory beneficiaries in their place [the statutes] are designed to protect [the divorced spouse] from such inattentiveness.

(quoting *Coughlin v. Bd. of Admin.,* 152 Cal. App.3d 70, 199 Cal.Rptr. 286, 287–88 (1984))(ellipses and third brackets in original).

¶ 31 Here, the dispositions to Mauro in Kathryn's trust became irrevocable on Kathryn's death—which came well before the probate court declared Kathryn's marriage invalid. Consequently, by its plain language, the statute did not revoke the dispositions Kathryn made to Mauro in her trust.

¶ 32 Both U.S. Bank and the Siblings argue, nevertheless, the trust was revocable because the declaration of invalidity related back to the date of Mauro's marriage to Kathryn and continued throughout the invalid marriage. As they see it, A.R.S. § 14–2804 disqualified Mauro from inheriting because his marriage to Kathryn was invalid from its inception.

¶ 33 The language of the statute, however, does not support their argument. Section 14–2804(I)(2) specifically refers to a "declaration of invalidity" and not merely the existence of an invalid marriage. Similarly, "revocable" is defined in terms of the "time" of the declaration, which is a finite moment and not a continuing period. A.R.S. §§ 14–2804(I)(2), (6). In addition, the statute expressly states that only changes in circumstances "as described" in the statute effect a revocation. A.R.S. § 14–2804(E).

¶ 34 The Siblings argue we should extend the express terms of the statute to apply to this situation because of this state's strong public policy against bigamous marriages. They also argue that such an extension would be consistent with the purpose of the statute which they say was to "presume revocation upon termination of a marriage."

¶ 35 Although we agree with the Siblings that Arizona's public policy against bigamous marriages is clear and well established, that policy does not authorize us to enlarge or extend the provisions of the statute. *See supra* ¶ 28. Further, the Siblings' characterization of the purpose of the statute sweeps too broadly. As explained above, the statute rests on the belief that a spouse who has terminated his or her marriage will not usually wish to leave any part of his or her estate to the former spouse. That purpose is not advanced here. Mauro and Kathryn did not terminate their marriage. Instead, their marriage was declared invalid after Kathryn's death.

¶ 36 Kathryn's trust was irrevocable at the time the probate court declared Mauro's marriage to Kathryn invalid. Therefore, A.R.S. § 14–2804 was inapplicable and did not revoke the dispositions to Mauro.

¶ 37 Mauro argues that he is entitled to take under Kathryn's will and trust even if their marriage was void and asserts that his cross-motion for summary judgment should have been granted. "The general rule is that in the absence of statutory provision limiting it, a man may dispose of his property as he sees fit, regardless of the fact that the prevailing code of morals may consider such disposition as unwarranted from any standpoint." *In re Nolan's Estate,* 56

Ariz. 353, 359, 108 P.2d 385, 388 (1940) *over-ruled in part on unrelated grounds by In re McConnell's Estate,* 101 Ariz. 538, 539, 421 P.2d 895, 896 (1966).[8] Under *Nolan's Estate,* Kathryn was free to decide how to dispose of her property, even if the recipient is a party to an invalid marriage. Nevertheless, Mauro is not entitled to judgment in his favor. The Siblings raised other arguments against Mauro's inheritance, including fraud and exploitation of a vulnerable adult, which have not yet been addressed by the probate court.[9]

## CONCLUSION

¶ 38 We affirm the probate court's decisions applying Arizona law and finding subject matter and personal jurisdiction. We agree with the probate court that under Arizona law, Kathryn's marriage to Mauro was void. However, we reverse the probate court's ruling that A.R.S. § 14–2804 applied to the facts of this case and revoked Kathryn's dispositions to Mauro. We remand for further proceedings consistent with this opinion.

CONCURRING: DANIEL A. BARKER, Judge and JON W. THOMPSON, Judge.

---

**8.** In *Nolan's Estate,* decedent's divorce from his first wife was never valid. 56 Ariz. at 357–59, 108 P.2d at 387–88. The court, nevertheless, enforced decedent's holographic will (written by decedent before he attempted to divorce his "first" wife), which bequeathed his property to the woman he eventually attempted to "marry."

**9.** Mauro also argues on appeal the probate court should have granted certain discovery requests. Given our resolution of the applicability of A.R.S. § 14–2804, we need not address this issue.